## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **Janet Waters, the surviving daughter of Decedent Donna Marie Burghardt, and the duly appointed Administrator of the Estate of Donna Marie Burghardt** | Case No. |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| v. | |
| **Parkview Health and Rehabilitation Center LLC** <br> <u>Serve:</u> <br> PLATINUM FILINGS LLC <br> 112 SW 7th St. Suite 3C <br> TOPEKA, KS 66603 | |
| **Kansas Healthcare Holdings LLC** <br> <u>Serve:</u> <br> PLATINUM FILINGS LLC <br> 555 E. LOOCKERMAN STREET, SUITE 320 <br> DOVER DE 19901 | |
| **Recover-Care Healthcare** <br> <u>Serve:</u> <br> PLATINUM FILINGS LLC <br> 555 E. LOOCKERMAN STREET, SUITE 320 <br> DOVER DE 19901 | |
| **Defendants.** | |

## PLAINTIFFS' COMPLAINT FOR DAMAGES

The Plaintiffs, by and through undersigned counsel, submit this Complaint for Damages against the above-named Defendants, and in further support, state and allege as follows:

### PLAINTIFFS

1. Donna Marie Burghardt ("Resident") developed an avoidable pressure injury which progressed to a full-thickness Stage 4 wound requiring surgical

debridement, on or about March 28, 2024, at Parkview Health and Rehabilitation Center LLC.

2.     Resident suffered conscious pain and suffering and died from the avoidable pressure injury on April 20, 2024.

3.     Plaintiff Janet Waters has been an adult over the age of 21 and is a citizen of Kansas.

4.     Plaintiff Janet Waters is the surviving daughter of the Resident, and therefore, member of the class of individuals authorized to pursue a wrongful death claim pursuant to K.S.A. § 60-1902.

5.     Plaintiff Janet Waters is the appointed Administrator of the Estate.

6.     The Estate is a citizen of Kansas.

## DEFENDANTS

7.     Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

### Parkview Health and Rehabilitation Center LLC

8.     At all times relevant, Parkview Health and Rehabilitation Center LLC was a Kansas limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Parkview Health and Rehabilitation Center LLC.

9.     As such, Parkview Health and Rehabilitation Center LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling Parkview Health and Rehabilitation Center LLC.

10.    Consequently, Parkview Health and Rehabilitation Center LLC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at Parkview Health and Rehabilitation Center LLC.

11.    The sole member of Parkview Health and Rehabilitation Center LLC is to be determined.

12.    To be determined is a citizen of Delaware

13.    Thus, Parkview Health and Rehabilitation Center LLC is a citizen of Delaware.

**Kansas Healthcare Holdings LLC**

14.    At all times relevant to this action, Defendant Kansas Healthcare Holdings LLC was a Kansas limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling Parkview Health and Rehabilitation Center LLC.

15.    Kansas Healthcare Holdings LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled Parkview Health and Rehabilitation Center LLC by exercising final authority over: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of Parkview Health and Rehabilitation Center LLC leadership.

16.    Kansas Healthcare Holdings LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and exercised final authority over Parkview Health and Rehabilitation Center LLC of: (1) Staffing budgets; (2) The development and

implementation of nursing policies and procedures; (3) The hiring and firing of Parkview Health and Rehabilitation Center LLC leadership.

17. It was Kansas Healthcare Holdings LLC intention to cut operating expenses at Parkview Health and Rehabilitation Center LLC through cutting of labor expenses while increasing revenue through increased census.

18. These actions and business decisions had a direct impact on the care provided to all residents including Resident.

19. Consequently, Kansas Healthcare Holdings LLC owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at Parkview Health and Rehabilitation Center LLC and breached said duty for all the reasons stated in this Petition.

20. The sole member of Kansas Healthcare Holdings LLC is To be determined.

21. To be determined is a citizen of Kansas.

22. Thus, Kansas Healthcare Holdings LLC is a citizen of the state of Kansas.

### Recover-Care Healthcare

23. At all times relevant to this action, Defendant Recover-Care Healthcare was a Kansas limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling Parkview Health and Rehabilitation Center LLC.

24. Recover-Care Healthcare, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled Parkview Health and Rehabilitation Center LLC by exercising final authority over: (1) Staffing budgets; (2) The development

and implementation of nursing policies and procedures; (3) The hiring and firing of Parkview Health and Rehabilitation Center LLC leadership.

25.   These actions and business decisions had a direct impact on the care provided to all residents including Resident.

26.   Consequently, Recover-Care Healthcare owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at Parkview Health and Rehabilitation Center LLC and breached said duty for all the reasons stated in this Petition.

27.   The sole member of Recover-Care Healthcare is To be determined.

28.   To be determined is a citizen of Kansas.

29.   Thus, Recover-Care Healthcare is a citizen of Kansas.

**DEFENDANTS' JOINT ENTERPRISE/VENTURE**

30.   Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

31.   Defendants Parkview Health and Rehabilitation Center LLC; Kansas Healthcare Holdings LLC; and Recover-Care Healthcare; ("Joint Venture Defendants") were engaged in a joint venture in that:

a.   The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate Parkview Health and Rehabilitation Center LLC, a Kansas licensed skilled nursing facility;

b.   The Joint Venture Defendants had had a common purpose to operate Parkview Health and Rehabilitation Center LLC, a Kansas licensed skilled nursing facility;

c.   The Joint Venture Defendants had a community of pecuniary interest in the operation of Parkview Health and Rehabilitation Center LLC, a Kansas licensed skilled nursing facility; and

    d.  The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of Parkview Health and Rehabilitation Center LLC, a Kansas licensed skilled nursing facility.

    e.  There has been always a close relationship between the Joint Venture Defendants relevant.

32.    Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at Parkview Health and Rehabilitation Center LLC.

## JURISDICTION AND VENUE

Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

33.    Each member of each defendant are citizens of Kansas.  Thus, each defendant is a citizen of Kansas.

34.    Plaintiffs are each a citizen of Kansas.

35.    Therefore, Plaintiffs brings these claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

36.    Pursuant to K.S.A. § 60-308(b)(2), defendants. purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing entering into contracts with entities in Kansas that then permitted them to commit tortious acts within the state including, but not limited to, failing to ensure that Parkview Health and Rehabilitation Center LLC had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

37.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Kansas, thereby making venue proper in this Court.

## AGENCY

38.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

39.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

### Defendants' Treatment of Resident

41.     Resident was admitted to Parkview Health and Rehabilitation Center LLC for skilled nursing care.

42.     Donna Marie Burghardt ("Resident") was admitted to Parkview Health and Rehabilitation Center on December 15, 2023, from Good Samaritan Village in Hays, Kansas. She was 99 years old, ambulatory with a walker, Alert and Oriented x3, and in good health at the time of her transfer to Parkview.

43.     Prior to her admission to Parkview, Resident had been residing at Good Samaritan Village from 2018 through December 2023 — a period of five years — and had

maintained stable functional status with no documented pressure ulcers, no fall risk, no elopement risk, and no circulatory problems.

44. At the time of admission on December 15, 2023, Resident was 121 pounds with a BMI of 19.6, presenting as Alert and Oriented x3 with mobility via walker and requiring no assistance with transfers. Her admission medical record documented no circulatory problems and no documented skin breakdown.

45. Resident had preserved cognitive function, maintained continence during the day, and required no assistive devices for basic mobility. Her past medical history documented hypertension managed with blood pressure medications, but no other significant medical comorbidities that would predispose to rapid pressure ulcer development.

46. An admission assessment was completed within 5 days of Resident's arrival at Parkview on December 21, 2023, documenting her initial skin status, functional status, and medical needs. Bates pages 0248-0249 and 0041-0042 contain the admission assessment documentation.

47. On December 21, 2023 — just six days after admission — the admission skin assessment documented Resident's skin status as "Not Intact" with specific findings of "Lower sacral region, upper buttock region with mild erythema at the tip of coccyx, superficial skin split and approximately 1mm superficial ulceration." This documentation establishes the baseline wound: a very small (1mm), superficial ulceration at the coccyx with no depth.

48. The December 21, 2023 assessment further detailed: "Small ulceration at tip of coccyx; superficial skin split; approximately 1mm superficial ulceration just above

tip of coccyx." This wound was at most a Stage 1 pressure injury — minimal, superficial, with intact skin edges and no depth. Bates pages 0207, 0215, 0008.

49.     Laboratory values obtained on admission (December 15, 2023) documented Resident's hemoglobin as 9.7 g/dL — lower than the normal range of 11.5-15.5, indicating pre-existing anemia. Bates pages 0209, 0217, 0010.

50.     Resident's admission weight of 121 pounds was below her stated normal weight range of 130-135 pounds — already indicating nutritional compromise at the time of admission. However, the admission assessment documented a care plan goal of weight maintenance and intervention for her documented "risk for weight loss."

51.     By January 22, 2024 — just 38 days after admission — Resident's wound had progressed to an "Unstageable - full thickness" pressure ulcer measuring 1.66 cm x 0.82 cm x 0.2 cm deep, with 100% slough wound bed. This progression from a 1mm superficial ulceration to a full-thickness wound in 38 days demonstrates facility-acquired deterioration. Bates pages 0201, 0203, 0336, 0338, 0002, 0004, 0193, 0195.

52.     By January 29, 2024 — day 45 of Resident's stay — the wound had enlarged to 2.12 cm x 1.29 cm x 0.3 cm, with continued 100% slough. The wound assessment documented this as "Wound enlarged," reflecting continued deterioration under facility care. Bates pages 0332, 0189.

53.     By February 5, 2024 — day 52 — the wound measured 1.75 cm x 0.89 cm x 0.3 cm, with 100% slough. Documentation noted the wound "has stalled," suggesting facility staff recognized the wound was not healing. Bates pages 0327, 0329, 0184, 0186.

54.     By February 12, 2024 — day 59 — the wound had grown significantly to 3.18 cm x 1.43 cm x 0.1 cm with 100% slough. Nursing reports documented that "Patient

removing dressing frequently." This documentation suggests wound exudate requiring frequent dressing changes and patient distress with the wound condition. Bates pages 0325, 0182, 0323, 0180.

55.    By February 19, 2024 — day 66 — the wound measured 1.63 cm x 1.58 cm x 0.1 cm with 100% slough. Bates pages 0320, 0113.

56.    By February 26, 2024 — day 73 — the wound remained unstageable with dimensions of 1.57 cm x 1.32 cm x 0.1 cm and 100% slough. Bates pages 0315, 0108.

57.    By March 4, 2024 — day 80 — the wound measured 1.37 cm x 1.44 cm x 0.1 cm with 90% slough and 10% granulation tissue, representing the first documented sign of any wound healing activity after 80 days of facility care. Bates pages 0310, 0103, 0308, 0101.

58.    By March 11, 2024 — day 87 — Resident's wound status was explicitly documented as having "DETERIORATED," with wound dimensions of 1.39 cm x 1.39 cm x 0.1 cm and 100% slough. This documentation establishes a clear indicator that facility staff recognized the wound was worsening despite ongoing care. Bates pages 0307, 0304, 0100, 0097.

59.    By March 18, 2024 — day 94 — routine skin assessment documented "Pressure ulcer to coccyx." Bates pages 0300, 0157, 0093.

60.    By March 25, 2024 — day 101 — wound assessment documented SECOND DOCUMENTED DETERIORATION with significant clinical change: the wound measured 1.69 cm x 2.04 cm x 0.1 cm, wound bed composition shifted to 90% eschar and 10% slough, and assessment noted "Continues unstageable pressure ulcer with

worsening, eschar now present." The appearance of eschar indicates wound infection and tissue necrosis. Bates pages 0297, 0295, 0294, 0154, 0152, 0151, 0090, 0088, 0087.

61.    On March 28, 2024 — day 104 of Resident's stay — Resident was finally seen by a wound care specialist, Dr. Theresia Neill, MD, at a wound care clinic. Pre-debridement, the wound measured 2.6 cm x 2.1 cm x 1.1 cm deep with eschar and foul odor. Post-surgical debridement with sharp currette under lidocaine anesthesia, the wound measured 2.9 cm x 2.2 cm x 1.7 cm deep — a Stage 4 pressure injury with subdermal depth, indicating loss of full-thickness skin and underlying tissue. Bates pages 0224, 0225, 0227, 0290, 0291, 0292, 0293, 0294, 0295, 0017, 0018, 0020, 0147, 0148, 0149, 0150, 0151.

62.    Dr. Neill's clinical assessment documented: "Unstageable pressure ulcer to sacrococcygeal region which has worsened since admission. Patient admitted with stage 1 on buttocks, now Stage 4 with 90% eschar, 10% slough." This specialist assessment directly attributes the Stage 4 wound to facility care, noting the escalation from a stage 1 at admission to Stage 4 under facility care.

63.    At the time of surgical debridement on March 28, 2024, Dr. Neill documented eschar present, foul odor present, periwound induration, necrotic tissue, and obtained a wound culture for infection analysis. These clinical findings establish that wound infection was developing during Resident's facility stay. Bates pages 0291, 0148, 0085.

64.    Post-debridement, Dr. Neill ordered: calcium alginate rope with sacral Mepilex dressing with daily changes, Bactrim DS for infection, and Tramadol 30 minutes

11

prior to wound care for pain management. These orders represent specialist-level wound care that facility staff were responsible for implementing. Bates pages 0224-0225.

65.    A wound culture was obtained during surgical debridement on March 28, 2024 — day 104 — but the timing establishes a critical failure: 104 days had elapsed from initial wound identification (December 21, 2023) until specialist evaluation and culture, allowing deep wound infection to develop entirely under facility care. Bates pages 0226, 0019.

66.    By April 1, 2024 — day 107 — Resident's wound dressing was documented as "soaked and needed changing," indicating continued wound exudate and inadequate dressing management. Bates pages 0287, 0144, 0080.

67.    On April 4, 2024 — day 111 of Resident's stay at Parkview — Resident was admitted to Osborne County Memorial Hospital with acute kidney injury (N17.9), chronic kidney disease stage 4 (N18.4), congestive heart failure (I50.9), and a documented Stage 4 pressure injury of the coccygeal region (L89.154). Hospital admission was necessitated by wound complications and acute systemic decline. Bates pages 0219, 0012, 0220, 0013.

68.    Resident's weight on hospital admission was documented as 126 pounds — down from her admission weight of 121 pounds and her normal range of 130-135 pounds, confirming nutritional decline during her Parkview stay despite the facility's documented care plan to maintain weight and monitor for losses.

69.    Immediately prior to hospital transfer, Dr. Neill's post-debridement recommendations included wound care with daily dressing changes, weekly follow-up, continued antibiotics (Bactrim DS), and pain management (Tramadol PRN). These

12

orders established the facility's responsibility to provide specialist-directed wound care until hospital transfer.

70. Following the March 28, 2024 specialist visit and surgical debridement, Resident remained at Parkview until April 4, 2024 — seven additional days — during which facility staff were responsible for implementing the post-debridement wound care orders, dressing changes, and ongoing assessment.

71. On April 15, 2024 — day 122, while Resident was hospitalized — an IDT note documented a Stage 4 coccyx ulcer in the "Sacral-coccygeal area." Bates pages 0266, 0123, 0059.

72. Resident's care plan, created on December 18, 2023, included documented interventions for the pressure ulcer problem: (1) "Observe and assess weekly"; (2) "Treatment as ordered to my coccyx"; (3) "Use absorbent incontinent briefs that hold moisture away from skin"; (4) "Use commercial moisture barrier on skin as indicated"; (5) "Use pressure redistribution surface to bed and wheelchair if indicated"; (6) "Will encourage resident to lay down for 30 minutes in morning and afternoon to relieve pressure off coccyx"; (7) "Will have Roho cushion in the recliner to alleviate pressure"; and (8) "Cleanse wound with generic wound cleanser. Apply skin prep to wound edges. Apply calcium alginate rope pack into wound bed, cover with mediplex dressing. Change daily and prn. Monitor placement of dressing every shift." Bates pages 0243, 0036.

73. Prior to her admission to Parkview, Resident had been hospitalized at Osborne County Memorial Hospital on November 15, 2023. Hospital discharge orders explicitly stated: "Turn every 2 hours. Avoid position directing pressure to wound site."

13

Bates pages 0223, 0016. This documented turning frequency was the standard of care that facility staff should have implemented and continued.

74. The medical review findings establish that Parkview facility failed to document any repositioning program implementation: on zero days did facility staff document good repositioning; on two days only partial repositioning was documented; and on 125 days (98.4%) no repositioning documentation appeared. Most significantly, 99.5% of all shifts (381 of 381 shifts) completely lacked any repositioning documentation. This pattern is consistent with abandonment of the repositioning program rather than selective documentation failure.

75. The progression from a 1mm superficial wound to a Stage 4 full-thickness injury with eschar and subdermal depth is entirely consistent with failure to relieve sacral pressure through repositioning. The every-2-hour turning program documented in the prior hospital discharge and standard pressure ulcer prevention protocols was not implemented, resulting in sustained pressure on the wound site and progressive deterioration.

76. Weight tracking during Resident's Parkview stay documented: admission (12/15/23) 121 lbs, peak (01/20/24) 131.4 lbs, nadir (02/03/24) 115.2 lbs. The drop from 131.4 to 115.2 pounds over 14 days (02/03 to 02/17) represents a loss of 16.2 pounds or 12.3% — exceeding the 7.5% loss threshold that triggers nutritional intervention protocols. This significant weight loss occurred despite a documented care plan goal of weight maintenance.

77. Although Resident was assessed as "at risk for weight loss" at admission, the first nutritional supplement was not ordered until January 9, 2024 — 25 days post-

14

admission. The supplement ordered was "Milk shake with 6-8 ounces with protein powder," indicating a belated attempt to address nutritional inadequacy. This 25-day delay in providing supplementation for a resident already below her normal weight and admitted with anemia directly contributed to the severe weight loss documented in February.

78.     Admission hemoglobin was 9.7 g/dL (lower than normal 11.5-15.5). Despite documented anemia and weight loss, no evidence of targeted nutritional intervention such as iron supplementation, vitamin B12, or folate supplementation appears in the documented care plan or treatment orders during the 127-day stay.

79.     Laboratory values obtained on hospital admission (April 4, 2024) documented: hemoglobin 9.8 g/dL (persistent anemia), albumin 3.1 g/dL (indicating malnutrition; normal 3.5-5.0), BUN 70 mg/dL (elevated; normal 7-20), creatinine 3.39 mg/dL (elevated; normal 0.7-1.3), and GFR 13 (severely impaired; normal >60). These lab abnormalities reflect cumulative malnutrition and organ dysfunction that had developed during Facility care.

80.     On April 16, 2024, the last week of life, nursing notes documented "Moans during reposition, peri care" — establishing that Resident was experiencing pain with positioning and wound care, yet no evidence appears in the record that pain management was proactively provided during the preceding 110+ days of stay. Tramadol was not ordered until March 28, 2024 (day 104) — after surgical debridement. Bates pages 0265, 0122, 0058.

81.     On April 17, 2024, one day before discharge, nursing notes documented: "Family refused staff access to resident to reposition or change brief and wound dressing,"

with the stated reason being inability to overcome family resistance to care. This documentation, combined with earlier documentation of pain with repositioning, establishes that the wound was causing Resident significant distress and that pain management was inadequate to permit necessary care. Bates pages 0264, 0121, 0057.

82.    Physician visits were documented on: 12/21/2023 (admission assessment), 01/25/2024 (weight consultation by phone), 02/21/2024 (lab clarification by phone), 03/03/2024 (care plan update), 03/28/2024 (specialist wound debridement), 04/03/2024 (notification of fall and wound status), 04/04/2024 (hospital admission), and 04/09/2024 (nutritional consultation). This documentation establishes that the attending physician had opportunities to assess wound progression and implement changes to the care plan but apparently did not escalate to specialist consultation until day 104.

83.    No documented evidence appears in the medical record of a consultant pharmacist review of Resident's medications during her 127-day stay at Parkview. Comprehensive medication reviews are a required component of nursing home interdisciplinary team assessment and would have potentially identified medication interactions, medication-related nutritional deficiencies, or the need for pain management and nutritional supplementation earlier in the course of care.

84.    On April 4, 2024 — day 111 of Resident's stay — Resident was discharged from Parkview to Osborne County Memorial Hospital with an active, unhealed Stage 4 sacral pressure injury measuring 2.9 cm x 2.2 cm x 1.7 cm deep with eschar and infection. The discharge occurred seven days after specialist surgical debridement and during the period when facility staff should have been implementing post-debridement wound care orders.

85. Resident was hospitalized for 16 days (April 4 - April 20, 2024) during which she received specialist wound management, inpatient wound care, medical management of acute kidney injury and congestive heart failure. The hospital admission diagnoses — acute kidney injury, chronic kidney disease stage 4, congestive heart failure, and Stage 4 pressure injury — represented the culmination of facility-caused deterioration during her 111-day Parkview stay.

86. Donna Marie Burghardt died on April 20, 2024 — 127 days after admission to Parkview and 16 days after hospital admission. The death certificate listed cause of death as Multisystem Failure with contributing causes of Acute Renal Failure and Congestive Heart Failure, with the facility-acquired and untreated Stage 4 pressure injury and associated wound infection directly contributing to her systemic decline. The facility's failure to prevent and treat the pressure ulcer that developed under its care, combined with inadequate nutritional support and pain management, directly caused or substantially contributed to her death.

87. Resident was at risk for developing pressure injuries.

88. Upon information and belief, despite Resident's risk for pressure injuries, none of Parkview Health and Rehabilitation Center LLC staff created a Care Plan for resident that implemented the appropriate interventions.

89. Upon information and belief, none of Parkview Health and Rehabilitation Center LLC staff implemented or applied the appropriate interventions to address Resident's risk of pressure injuries.

90. Upon information and belief, from admission to his discharge, none of Parkview Health and Rehabilitation Center LLC staff:

17

a.   Properly assessed Resident's risk of pressure injuries;

b.   Implemented or provided the appropriate interventions to prevent Resident from developing avoidable pressure injuries, including appropriate supervision and pressure injury preventions;

c.   Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

d.   Monitored Resident's condition, including Resident's risk for developing an avoidable pressure injury during this time frame.

91.   Upon information and belief, at no point while Resident was a resident at Parkview Health and Rehabilitation Center LLC did any of Parkview Health and Rehabilitation Center LLC management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever provide any sort of in-service training or clinical education to Parkview Health and Rehabilitation Center LLC staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

92.   Upon information and belief, at no point while Resident was a resident at Parkview Health and Rehabilitation Center LLC did any of Parkview Health and Rehabilitation Center LLC management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever implement the appropriate policies and procedures at Parkview Health and Rehabilitation Center LLC regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

93.   Upon information and belief, while Resident was a resident at Parkview Health and Rehabilitation Center LLC, Parkview Health and Rehabilitation Center LLC did not have an adequate number of staff working daily at Parkview Health and Rehabilitation Center LLC to meet Resident's needs, perform the interventions required

to prevent Resident's avoidable pressure injury, or monitor and adequately supervise Resident's condition.

### Undercapitalization/Underfunding at Parkview Health and Rehabilitation Center LLC

94.     Kansas Healthcare Holdings LLC; Recover-Care Healthcare; and Parkview Health and Rehabilitation Center LLC had a duty to provide financial resources and support to Parkview Health and Rehabilitation Center LLC in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

95.     Kansas Healthcare Holdings LLC; Recover-Care Healthcare; and Parkview Health and Rehabilitation Center LLC had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

96.     Upon information and belief, Parkview Health and Rehabilitation Center LLC had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

97.     Upon information and belief, no individuals at Parkview Health and Rehabilitation Center LLC are involved in decision making about the financial operations or what its resources were and where they would be spent.

98.     Transactions directed by Recover-Care Healthcare and Kansas Healthcare Holdings LLC left Parkview Health and Rehabilitation Center LLC with insufficient cash

to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

99.     Parkview Health and Rehabilitation Center (CMS Certification Number 175409, NPI 1366180424), located at 811 N 1st Street, Osborne, Kansas 67473, in Osborne County, is classified by CMS as a "For profit - Limited Liability Company" facility with 58 certified beds and an average daily census of 45.6 residents.

100.    CMS assigned Parkview Health and Rehabilitation Center a 1-Star Overall Rating ("Much Below Average"), including: 1-Star Health Inspection Rating ("Much Below Average"), 1-Star Quality Measures Rating ("Much Below Average"), 1-Star Staffing Rating ("Much Below Average"), and 1-Star RN Staffing Rating ("Much Below Average"). These ratings placed Parkview in the bottom tier of all nursing facilities nationally.

101.    The most recent CMS survey on August 20, 2025 identified 20 health deficiencies and deficiency tags in categories including resident rights (3 deficiencies), abuse/neglect prevention (3 deficiencies), care planning quality (2 deficiencies), safety (1 deficiency), staffing administration (4 deficiencies), pharmacy services (3 deficiencies), nutrition (2 deficiencies), and infection control (1 deficiency). CMS imposed one monetary penalty of $16,834 on Parkview Health and Rehabilitation Center.

102.    Of the 20 cited deficiencies, 15 were cited at severity levels D, E, or F (the most serious severity levels), indicating systemic or high-risk violations. Notably, staffing administration deficiencies were cited at severity levels C, D, and F, with F-level (systemic) deficiencies identified in both staffing (tag 0732) and nutrition (tags 0801, 0812) categories.

103.   Parkview Health and Rehabilitation Center is operated by Parkview Health and Rehabilitation Center LLC (facility operator), with oversight by Kansas Healthcare Holdings LLC (facility management), both as part of a broader chain operated under Recover-Care Healthcare (Chain ID 438), a corporate parent operating 26 facilities across multiple states. The absentee ownership structure places financial and management control at the corporate parent level, removed from the facility location.

104.   CMS Payroll-Based Journal (PBJ) data documents that Parkview staffing for registered nurses averaged only 0.367 hours per resident per day (HPRD) during the relevant period. With an average daily census of 45.6 residents, 0.367 HPRD translates to approximately 16.8 total RN hours per day — insufficient to provide nursing assessment, care coordination, and clinical oversight for nearly 46 residents.

105.   RN turnover at Parkview was documented at 81.8%, meaning that over four in five registered nurses left the facility within a 12-month period. This extreme turnover directly compromises wound assessment expertise, medication management oversight, and continuity of physician communication regarding resident clinical changes.

106.   Licensed Practical Nurse staffing at Parkview averaged 0.602 HPRD, translating to approximately 27.5 total LPN hours per day for 45.6 residents. LPNs are responsible for medication administration, wound care, and clinical monitoring — functions requiring consistency and expertise that extreme turnover (60.7% overall nursing turnover) compromises.

107.   Certified Nursing Assistant staffing at Parkview averaged 1.995 HPRD, translating to approximately 91 total CNA hours per day for 45.6 residents. CNAs provide the hands-on repositioning, hygiene, incontinence care, and feeding assistance

that pressure ulcer prevention and general care require. With multiple residents per CNA and complex care needs including residents requiring Hoyer lifts and specialized wound care, the CNA-to-resident ratio was inadequate.

108.    Combined nursing staffing — RN (0.367) + LPN (0.602) + CNA (1.995) = 2.964 HPRD total. For a facility with 45.6 average daily census, this totals approximately 135 combined nursing hours per day, or approximately 3 nurses per shift (day, evening, night) across all 58 certified beds. This staffing level is grossly inadequate for a facility caring for complex, dependent residents.

109.    Federal regulations (42 CFR 483.35(f)) establish that facilities must provide sufficient staffing, but do not mandate minimum staffing ratios. However, industry standards typically recommend 0.75 HPRD for RNs and 3.0+ HPRD for total nursing (RN+LPN+CNA) in skilled nursing facilities. Parkview's RN staffing of 0.367 HPRD is less than half the standard, and total nursing of 2.964 HPRD falls below recommended minimums.

110.    For Resident Burghardt, who required assessment of a complex sacral wound with multiple measurements and assessments per the care plan ("Observe and assess weekly"), adequate RN staffing was critical to: (1) perform initial comprehensive wound assessments, (2) recognize wound progression and deterioration, (3) communicate findings to physicians, (4) escalate to specialist consultation, and (5) implement care plan changes based on wound status changes. The chronic shortage of RN hours meant assessment and escalation were delayed or absent.

111.    For Resident Burghardt, who was assessed as "at risk for weight loss" at admission, adequate RN staffing was necessary to: (1) monitor weekly weights as

documented in the care plan, (2) recognize the 12.3% weight loss that occurred in February, (3) escalate nutritional concerns to the physician, and (4) ensure timely implementation of nutritional supplementation. The delay in supplement ordering (25 days) and the uninterrupted weight loss suggest adequate RN oversight was absent.

112.    The medical records provided contain no Treatment Administration Records (TARs), no Medication Administration Records (MARs), and no Diet/Activities Shift Reports (DSRs) — standard nursing documentation forms that establish accountability for implemented care. The absence of these forms across the 127-day stay prevents verification of whether turning/repositioning, wound dressing changes, nutritional supplements, or pain medications were actually administered as ordered.

113.    Nursing notes exist but demonstrate consistent gaps in shift-by-shift care documentation. Repositioning notes on 99.5% of shifts (381 of 381) completely lack any documentation of movement, positioning, or turning, despite the care plan documenting that resident should be "encouraged to lay down for 30 minutes in morning and afternoon to relieve pressure off coccyx."

114.    Weekly skin assessments were documented, but their quality appears poor: one assessment documented only "Pressure ulcer to coccyx. No. No." (Bates pages 0300, 0157, 0093) despite the facility's own detailed wound measurements from the same period showing progressive enlargement and deterioration. This pattern suggests either copy-paste documentation without clinical review or inadequate RN involvement in assessment.

115.    Despite a documented care plan requiring turning "for 30 minutes in morning and afternoon" and a prior hospital discharge order requiring turning "every 2

23

hours," the complete absence of repositioning documentation (98.4% of days) across 127 days indicates a systemic failure to implement the turning program. This failure is directly attributable to inadequate staffing: CNAs cannot simultaneously turn multiple dependent residents if staffing levels are insufficient.

116.   The 98-day delay from initial wound identification (December 21, 2023) to first specialist consultation (March 28, 2024) reflects both a decision-making failure at the provider level and an RN communication failure. Adequate RN staffing would have included at least one RN responsible for wound assessment and physician communication who would have escalated wound deterioration earlier.

117.   The 25-day delay in implementing nutritional supplementation despite documented "at risk for weight loss" status reflects inadequate RN oversight and care coordination. An RN with adequate time allocation would have: (1) performed the initial comprehensive nutritional assessment, (2) recognized the need for supplementation, (3) proactively communicated with the physician, and (4) ensured timely supplement ordering.

118.   Pain management was inadequate throughout Resident's stay, with Tramadol not ordered until day 104 (post-surgical debridement), despite documentation at day 109 of "Moans during reposition, peri care" indicating pain with normal care activities. Adequate RN staffing would have identified pain as a barrier to care implementation early in the wound development process.

119.   The 81.8% RN turnover at Parkview means that the RN staff who might have assessed Resident's wound progression, communicated with physicians, and implemented care plan changes were likely different individuals at different times during

24

the 127-day stay, with no consistent oversight or continuity of care. This turnover directly undermines the ability to identify progressive clinical deterioration.

120. Parkview is operated under Recover-Care Healthcare, a corporate parent chain with 26 facilities operating across multiple states. Financial and staffing decisions are made at the corporate parent level, located outside Kansas, prioritizing cost reduction over quality of care. The documented 1-star staffing rating and CMS deficiencies in staffing and nutrition are direct results of undercapitalization by the corporate parent.

121. Recover-Care Healthcare (Chain ID 438) operates Parkview as one of 26 facilities, allowing pooling of revenue and resources but enabling the corporation to allocate insufficient resources to this particular facility. The absentee ownership structure removes accountability for individual facility performance from local decision-makers and places it with corporate offices focused on profit maximization.

122. The documented care failures — abandoned repositioning program, delayed nutritional supplementation, delayed specialist consultation, inadequate pain management, missing documentation systems, and poor wound progression assessment — all flow directly from undercapitalization reflected in the RN staffing of 0.367 HPRD (less than half industry standards), extreme RN turnover of 81.8%, and absence of basic nursing documentation systems (TARs, MARs, DSRs).

123. CMS's identification of 20 deficiencies and imposition of a $16,834 penalty directly reflected Parkview's systemic undercapitalization. F-level (systemic) deficiencies in staffing (0732) and nutrition (0801, 0812) confirm that the facility's undercapitalization resulted in systemic rather than isolated failures to meet regulatory standards and resident care needs.

## LEGAL BASIS FOR Kansas Healthcare Holdings LLC AND Recover-Care Healthcare's LIABILITY

### Joint Venture/Enterprise

124. Kansas Healthcare Holdings LLC and Recover-Care Healthcare are collectively referred to herein as the "Corporate Defendants."

125. The Corporate Defendants directed, operated, and managed the day-to-day functions of their skilled nursing facilities – including Parkview Health and Rehabilitation Center LLC – by developing and implementing policies, practices and procedures affecting all facets of Parkview Health and Rehabilitation Center LLC, including resident care.

126. These policies manipulate and control the physical and financial resources and prohibit decision making at Parkview Health and Rehabilitation Center LLC level.

127. This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

128. The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

129. Upon information and belief, such operations included the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff Parkview Health and Rehabilitation Center LLC and continually maintain a staff that were not qualified nor competent to provide the care required by state law,

26

regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of Parkview Health and Rehabilitation Center LLC's staff.

130.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

131.    The Corporate Defendants conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

   a. The shared interest in the operation and management of skilled nursing facilities;

   b. The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

   c. The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing skilled nursing facilities.

132.    Kansas law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

133.    The Corporate Defendants share a common interest in the operation and management of skilled nursing facilities, including Parkview Health and Rehabilitation Center LLC; maintain agreements to share in the profits or losses of the operation of skilled nursing facilities described herein; and operate daily evincing conduct which

indicates their cooperation in the venture of operating and managing skilled nursing facilities for profit.

134. The Corporate Defendants and Parkview Health and Rehabilitation Center LLC took direct, overt, and specific actions to further the interest of the joint enterprise.

135. These actions were taken through a joint venture/enterprise or through the Corporate Defendants and Parkview Health and Rehabilitation Center LLC's officers, directors, managers and or employees.

136. The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

137. Further, because the Corporate Defendants and Parkview Health and Rehabilitation Center LLC were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of Parkview Health and Rehabilitation Center LLC.

### Direct Participation/Individual Actions

138. The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of skilled nursing facilities throughout the Kansas and the country. One such skilled nursing facilities was Parkview Health and Rehabilitation Center LLC where Resident was admitted for care and treatment.

139. At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their skilled nursing facilities – including Parkview Health and Rehabilitation Center LLC – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and

expenditures on staffing levels; (2) the determination of the census levels within the skilled nursing facilities; and, (3) payor mix.

140.    At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted Parkview Health and Rehabilitation Center LLC's revenues and expenditures.    More particularly, the Corporate Defendants determined:

      a.  The number of staff allowed to work in their chains of skilled nursing facilities including Parkview Health and Rehabilitation Center LLC;

      b.  The expenditures for staffing at the skilled nursing facilities including Parkview Health and Rehabilitation Center LLC;

      c.  The revenue targets for each skilled nursing facilities including Parkview Health and Rehabilitation Center LLC;

      d.  The payor mix, and census targets for each skilled nursing facilities including Parkview Health and Rehabilitation Center LLC;

      e.  Patient recruitment programs and discharge practices at each skilled nursing facilities including Parkview Health and Rehabilitation Center LLC.

141.    All cash management functions, revenues and expenditure decisions at the skilled nursing facilities level – including Parkview Health and Rehabilitation Center LLC – were tightly managed, directed, and supervised by the Corporate Defendants.

142.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including Parkview Health and Rehabilitation Center LLC.

143.    The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

144. The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

145. Following the mandates, Parkview Health and Rehabilitation Center LLC functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

146. Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and Parkview Health and Rehabilitation Center LLC as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

147. Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

148. The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring Parkview Health and Rehabilitation Center LLCto recruit and retain heavier care, higher pay residents to Parkview Health and Rehabilitation Center LLC even though the needs of the patient population far exceeded the capacity of staff.

149. At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at  Parkview Health and Rehabilitation Center LLC which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

150. In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed skilled nursing facility, in this case Parkview Health and Rehabilitation Center LLC, by the State of Kansas.

## Corporate Malfeasance

151. The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

152. Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

153. These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendants and Parkview Health and Rehabilitation Center LLC.

154. Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at Parkview Health and Rehabilitation Center LLC including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death. This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

155. During Resident's residency at Parkview Health and Rehabilitation Center LLC, Resident sustained physical injuries and died, as described in more detail above,

31

because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating Parkview Health and Rehabilitation Center LLC.

156. During Resident's residency at Parkview Health and Rehabilitation Center LLC, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above. Ultimately, Resident died because of this failure.

157. The Corporate Defendants manage, operate, and direct the day-to-day operations of Parkview Health and Rehabilitation Center LLC and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiffs for the neglect of and injuries to Resident.

158. Parkview Health and Rehabilitation Center LLC and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

    a. Chosen to disregard the duties and responsibilities which Parkview Health and Rehabilitation Center LLC, as a licensed skilled nursing facility, owed to the State of Kansas and its residents;

    b. Created the dangerous conditions described by interfering with and causing Parkview Health and Rehabilitation Center LLC to violate Kansas statutes, laws and minimum regulations governing the operation of said skilled nursing facilities;

    c. Superseding the statutory rights and duties owed to skilled nursing facilities residents by designing and mandating dangerous directives, policies, management, and day to day operation of Parkview Health and Rehabilitation Center LLC;

    d. Caused the harm complained of herein; and

e.  Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

## **Count I - (Wrongful Death Against All Defendants)**

159.  At all times material hereto Resident was in a defenseless and dependent condition.

160.  As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

161.  At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

162.  At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

163.  These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

164.  These duties required Defendants to have sufficient and qualified staff at Parkview Health and Rehabilitation Center LLC skilled nursing facilities to ensure the proper care for, and treatment of all residents including Resident.

165.  These duties required Defendants to ensure that Parkview Health and Rehabilitation Center LLC's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

33

166. These duties required Defendants to ensure that Parkview Health and Rehabilitation Center LLC was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

167. Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

    a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

    b. Failing to adequately assess Resident's risk of developing pressure injuries;

    c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

    d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

    e. Failing to turn and reposition Resident every two hours;

    f. Failing to have enough staff at Parkview Health and Rehabilitation Center LLC to ensure Resident's needs were being met regarding pressure injury prevention;

    g. Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injuries;

    h. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injuries;

    i. Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries;

    j. Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

    k. Failing to prevent the development and worsening of Resident's pressure injuries;

l.  Failing to timely report Resident's changes in condition to a physician;

m.  Failing to carry out the instructions of Resident's physician;

n.  Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of developing pressure injury;

o.  Failing to timely transfer Resident to a Facility that could provide adequate care;

p.  Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

q.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressure injuries in residents like Resident;

r.  Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's pressure injuries;

s.  Failing to ensure the skilled nursing facilities was properly capitalized.

t.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

168.  As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

169.  As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiffs suffered damages including, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

WHEREFORE, PlaintiffJanet Waters (individually), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable including only non-economic damages.

### COUNT II - (Pain and Suffering by the Estate v. All Defendants)

170.   At all times material hereto Resident was in a defenseless and dependent condition.

171.   As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

172.   At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

173.   At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

174.   These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

175.   These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

176. These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

177. These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

178. Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

   b. Failing to adequately assess Resident's risk of developing pressure injuries;

   c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

   d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

   e. Failing to turn and reposition Resident every two hours;

   f. Failing to have enough staff at Parkview Health and Rehabilitation Center LLC to ensure Resident's needs were being met regarding pressure injury prevention;

   g. Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injuries;

   h. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injuries;

i.   Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries;

j.   Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

k.   Failing to prevent the development and worsening of Resident's pressure injuries;

l.   Failing to timely report Resident's changes in condition to a physician;

m.  Failing to carry out the instructions of Resident's physician;

n.   Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of developing pressure injury;

o.   Failing to timely transfer Resident to a Facility that could provide adequate care;

p.   Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

q.   Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressure injuries in residents like Resident;

r.   Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's pressure injuries;

s.   Failing to ensure the skilled nursing facilities was properly capitalized.; and

t.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

179.   As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

180.     The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

181.     At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during the two years preceding Resident's death and the year of death created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

182.     Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

183.     As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including conscious pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

184.     The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

39

WHEREFORE, Plaintiff (The Estate) prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages and past medical expenses.

### Count III - (Alter Ego Against Recover-Care Healthcare)

185.   Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

186.   Parkview Health and Rehabilitation Center LLC ("Subsidiary") is so dominated by Recover-Care Healthcare that the Subsidiary is a mere instrument of Recover-Care Healthcare and is indistinct from Recover-Care Healthcare.

187.   In fact, the Subsidiary is controlled and influenced by Recover-Care Healthcare in that Recover-Care Healthcare exercised complete control and domination over the Subsidiary finances and business practices.

188.   Specifically, Recover-Care Healthcare complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

189.   Recover-Care Healthcare's complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the two years preceding the negligence in this case.

190.   Recover-Care Healthcare's complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets during the two years preceding the negligence in this case.

191.   Specifically: (1) Recover-Care Healthcare own all or most of the capital stock of the Subsidiary; (2) Recover-Care Healthcare and the Subsidiary have common

40

directors or officers; (3) Recover-Care Healthcare finance the Subsidiary; (4) Recover-Care Healthcare subscribe to all of the capital stock of the Subsidiary; (5) Recover-Care Healthcare caused the incorporation of the Subsidiary; (6) The Facility has grossly inadequate capital; (7) Recover-Care Healthcare pays the salaries and other expenses or losses of the Subsidiary; (8) Recover-Care Healthcare use the property of the Subsidiary as its own; and (9) The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from Recover-Care Healthcare in the latter's interest.

192.    Thus, Recover-Care Healthcare used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that Recover-Care Healthcare's complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

193.    This undercapitalization and understaffing violated duties and the applicable standard of care owed by a skilled nursing facilities operator or manager to the Facility's residents.

194.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and Recover-Care Healthcare – Resident was harmed and suffered non-economic damages including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

195.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and Recover-Care Healthcare – Plaintiffs, suffered

damages including loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, conscious pain and suffering; and mental anguish.

WHEREFORE, Plaintiffs, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable including non-economic damages and past medical expenses.

## **PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

STEELE LAW FIRM II, LLC

*/s/ Jonathan Steele*
Jonathan Steele
MO#63266/KS#24852/OK# #35997
Email: jonathan@nursinghomeabuselaw.com
Direct: (913) 356-9630
Office: (816) 466-5947
Fax: (913) 416-9425
nursinghomeabuselaw.com

Missouri Office
2029 Wyandotte, Suite 100
Kansas City, MO 64108

Oklahoma Office
15401 N. May Ave., Suite 1100
Edmond, OK 73013

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on 2026-03-27 a copy of the above and foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system to all parties and attorneys of record.

*/s/ Jonathan Steele*
Attorney for Plaintiff(s)